# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ELIZABETH CROOKS, | CIVIL ACTION NO. 3:11-CV-1036 |
| Plaintiff, | |
| v. | (JUDGE CAPUTO) |
| NATIONAL OILWELL VARCO, L.P. | |
| Defendant. | |

## MEMORANDUM

Presently before the Court is a Motion for Summary Judgment filed by Defendant National Oilwell Varco, L.P. ("NOV"). (Doc. 40.) Plaintiff Elizabeth Crooks brings hostile work environment sexual harassment, gender discrimination, and retaliation claims against NOV pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* NOV contends that the Court should enter summary judgment in its favor on all claims because Crooks cannot establish a *prima facie* case of harassment, discrimination, or retaliation. For the reasons below, NOV's summary judgment motion will be denied.

## BACKGROUND

### A. Factual Background

Unless otherwise indicated, the following material facts are undisputed. NOV, which provides products and services for oil and gas drilling operations, opened a Distribution Services Center ("DSC") in Troy, Pennsylvania in September 2009. (Def.'s Statement of Material Facts ("SMF") at ¶ 1.) Crooks began working as an administrative assistant at the Troy DSC through a temporary employment agency on September 17, 2009. (*Id.* at ¶ 3.) Jason Smith, an account representative, became the manager of the Troy DSC in October 2009. (*Id.* at ¶ 5.) Smith reported to regional manager Nathan Smidt, who did not work out

of the Troy DSC but stopped by periodically. (*Id.*) On Smith's recommendation, NOV hired Crooks on February 16, 2010. (*Id.* at ¶ 6.) Around that same time, he offered Crooks a promotion to an inside sales representative position, which she accepted. (*Id.*) Crooks contends that Smith did so despite telling her that she would not be good at the job because women do not belong in the oil filed. (Crooks Dep. at 93:10–94:1.)

Crooks received and filled out a packet of paperwork around the time of her hire. (*Id.* at 95:20–24.) She was given documentation regarding NOV's operating policies and procedures, including its Equal Employment Opportunity ("EEO"), anti-harassment, anti-discrimination, and anti-retaliation policies. (*Id.* at 96:8–97:7.) Crooks understood the policies and that NOV had a Human Resources ("HR") department. (*Id.*) However, there was no orientation regarding these policies; she merely received the paperwork and was told to complete and return it. (*Id.* at 96:1–7.)

Smith treated nearly all of his subordinates poorly and was disliked for it. (*Id.* at 41:4–42:20.) He frequently told them that he had powerful friends at NOV and that it was "his way or the highway" at the Troy DSC.[1] (Crooks Dep. at 278:5–16.) On several occasions, he stated that he would "beat up" anyone, whether male or female. (*Id.* at 280:2–14.) Smith repeatedly instructed sales representatives that "money talks and bullshit walks"—*i.e.*, that they would be terminated if their sales did not increase—and that their "heads were going to fucking roll" if sales did not improve. (*Id.* at 156:6–13, 278:17–279:6.) On one occasion in April 2010, he hit the back of Crooks' chair with a plastic "wiffle ball" bat

---

[1] Smith repeatedly claimed that he was "untouchable" due to his friendships with NOV HR personnel and that any employee who reported him or anyone else for sexual harassment would be terminated. (Crooks Dep. at 192:15–22, 275:10–276:2.)

while she was sitting in it and told her that her "head was going to fucking roll if [she] didn't get her sales up." (*Id.* at 154:24–155:8, 157:8–15.) Crooks was the only woman in the sales room. (*Id.* at 155:21–156:5.) Although Smith hit other sales representatives' desks with the bat when they were not sitting there, he did not hit anyone else's chair with it. (*Id.* at 155:21–157:7.) Smith also told Crooks to "shut the fuck up" at times, and she was fearful of him. (Crooks Dep. at 177:12–17, 277:1–4.)

Smith also displayed images of nude women on a computer screen in the sales room and gathered male employees to look at them. (*Id.* at 167:20–172:13.) This occurred approximately twice every other week for thirty to forty-five minutes. (*Id.*) Crooks could see the images from her desk and felt uncomfortable; when Smith invited her to come look at them, she declined. (*Id.* at 170:2–6, 171:12–18.) Also, on one occasion, Smith walked in on a private conversation between Crooks and another female co-worker who was laughing. (*Id.* at 141:3–142:9.) When Crooks declined to tell him what was so funny, Smith told her that she would be fired if she did not go to his office and repeat what was said. (*Id.* at 142:9–18.) Crooks complied and retold the story of an embarrassing sexual situation that she had with her boyfriend; Smith said that the story was hilarious and that the rest of the office needed to hear it.[2] (Crooks Dep. at 142:19–143:15.)

Around November of 2009, the employees of the Troy DSC had a safety meeting at which sexual harassment was discussed. (*Id.* at 148:12–14, 152:20–153:4.) This was the only meeting during Crooks' tenure at NOV during which sexual harassment was discussed.

---

[2] Although Crooks did not tell sexual jokes at work, other employees did. (Crooks Dep. at 146:15–21.) She did not think that the jokes were funny, but would respond by snickering and shaking her head in an attempt to fit in. (*Id.* at 146:22–147:9.)

3

(*Id.* at 153:5–8.) During the meeting, NOV's policies on harassment and discrimination were not reviewed; instead a pamphlet detailing and describing sexual harassment in the workplace was mocked by Smith and other male employees. (*Id.* at 150:13–152:19.) Smith reiterated that he had friends in NOV's HR department. (*Id.* at 152:5–8.) When Crooks asked Smith if he realized that some of his comments at work could be considered harassing, he responded that he would like to see an employee charge NOV with sexual harassment because they would be terminated immediately. (*Id.* at 148:12–22.)

Although Smith's duties occasionally required him to work outside the Troy DSC, he called Crooks "a dumb fucking cunt" in front of other employees in the sales room every day he was there and continued to do so even though she told him that it offended her. (Crooks Dep. at 137:14–138:18, 147:10–148:7, 277:13–24.) Smith would occasionally say "cunt" around male employees, who laughed it off, but Crooks did not hear him use the word around any other female employee.[3] (*Id.* at 139:20–140:7, 276:3–17.) On one occasion, Smith received a picture of his wife with newly-highlighted hair on his cell phone and remarked to other employees, including Crooks, that his wife was "a stupid fucking bitch" who looked "like a fucking whore" and stated that he might have to go home and "beat the shit out of her" for getting highlights. (*Id.* at 172:18–174:16.) Crooks told Smith that his comments about beating his wife were bothersome and inappropriate, as she had been in an abusive relationship, but he did not stop making them. (*Id.* at 276:18–277:4.)

In or around April 2010, Crooks asked Smith about how to apply for an outside sales representative position with NOV. (*Id.* at 123:3–13.) Smith stated that applying would be

---

[3] Crooks also testified that male and female employees, herself included, frequently used curse words, including "fuck," at work. (Crooks Dep. at 138:7–139:19.)

4

a waste of her time because she had "tits" and reiterated his view that women did not belong in the oil field. (*Id.* at 123:15–17, 23–24.) Crooks went to Smidt and informed him of Smith's comments; he laughed and said that Smith was merely joking.[4] (Crooks Dep. at 127:16–128:9.) She became extremely upset, and the conversation ended soon thereafter. (*Id.* at 128:10–17.) On June 16, 2010, Crooks applied for the outside sales representative position by e-mailing Smidt and Smith. (*Id.* at 128:18–129:19.) A few days later, she asked Smith about the status of her application. (*Id.* at 130:9–19, 131:21–23.) Smith responded that the position would probably be awarded to a male employee because "bros before hoes"—*i.e.*, that a male candidate would be chosen before a female candidate. (*Id.* at 130:16–19, 131:21–132:1.)

Early one morning in May or June of 2010, Crooks had to deliver parts to a nearby Nomac Drilling rig. (*Id.* at 174:22–24; 177:5–7.) At the rig, a male Nomac employee that Crooks had been speaking with told her that she needed to go to the back of his trailer so that he could perform oral sex on her. (Crooks Dep. at 176:3–5.) The comment made Crooks uncomfortable, and she promptly left. (*Id.* at 176:5–6.) When she went to the Troy DSC later that morning, she told Smith about the incident. (*Id.* at 176:7–9.) Smith slammed his hand on the desk and asked Crooks why she did not appease the Nomac employee. (*Id.* at 177:7–10.) When she responded incredulously, Smith stated that NOV was trying to "lock down that account." (*Id.* at 176:11–14.) Crooks, who was extremely upset and

---

[4] Crooks testified that she talked to Smidt multiple times about Smith's "inappropriate sexual behavior." (Crooks Dep. at 281:2–5.) She testified that she told Smidt in February 2010 that Smith had a bad attitude, but Smidt replied that "it's all part of the business." (*Id.* at 281:10–282:1.) Smidt, on the other hand, testified at his deposition that Crooks made one complaint to him about Smith being a stern manager, but never complained that Smith used vulgar language or engaged in any sexually harassing or discriminatory behavior. (Smidt Dep. at 43:24–45:8.)

crying, retrieved the hand lotion from her desk and slammed it on Smith's desk, telling him that if he wanted the account, he could "go get it [himself]." (*Id.* at 176:14–23.) This incident was "the last straw" for her. (Crooks Dep. at 177:10–11.)

On June 30, 2010, Crooks e-mailed Smidt informing him that she was resigning from her position effective immediately. (*Id.* at Ex. 4.) She stated in the e-mail that Smith was "immature and unprofessional," that his "insults and behavior" demonstrate a lack of respect for others, and working for him was "the most uncomfortable, unpleasant, intimidating, and demeaning" work experience that she had. (*Id.*) Crooks also claimed that Smith "makes the work environment hostile" and that she could no longer work under such conditions. (*Id.*) Although Crooks did not specify in her e-mail that Smith made sexual or vulgar comments to her, she testified at her deposition that "demeaning" meant that his treatment of her was demeaning in a sexual way. (Crooks Dep. at 135:8–136:2.) Prior to resigning, Crooks had not contacted anyone at NOV's HR department or headquarters about any inappropriate treatment from Smith.[5] (*Id.* at 136:22–137:6, 163:12–164:3.) She told Smith approximately nine times during her tenure at NOV that she believed that his comments or behavior constituted sexual harassment, but he did not stop. (*Id.* at 282:13–283:6.)

In a declaration, Nancy Sosa, a HR Generalist at NOV's headquarters, states that

---

[5] In fall 2009, NOV's HR department investigated an employee accused of sexually harassing Crooks. (Crooks Dep. at 189:2–190:5.) The investigation was spurred by a complaint lodged by Smith, purportedly on Crooks' behalf. (*Id.* at 190:11–13.) Crooks believes that Smith's complaint was groundless and an attempt to have the employee terminated. (*Id.* at 186:12–16, 187:16–20.) When a HR representative called Crooks and asked her if she had a problem with the employee, she said that she did not and that he was not the employee that they needed to worry about. (*Id.* at 190:14–17.) Crooks did not elaborate on her comment or complain about Smith's behavior for fear of retaliation (*Id.* at 186:20–187:9) and the HR representative did not ask her what she meant by the comment (*Id.* at 190:18–191:3).

she and Jonathan Ramsey, a HR Director for NOV, learned of Crooks' resignation on June 30, 2010 and called her to obtain more information and see if they could address her concerns. (Sosa Dec. at ¶¶ 1, 5–6.) They were unable to reach her and left a message; Crooks returned their call later that day. (*Id.* at ¶ 6.) At that time, Crooks reiterated the concerns raised in her e-mail and added that Smith had made gender-related comments as well as inappropriate comments of a sexual and vulgar nature. (*Id.* at ¶ 7.) Ramsey informed Crooks that NOV takes such allegations very seriously and would investigate them, take action if any violation were found, inform her of the investigation's results, and protect her from retaliation. (*Id.*) He also told Crooks that he would not accept her resignation and wanted the opportunity to investigate and resolve her concerns. (*Id.*) Crooks testified that she does not remember speaking with Ramsey or Sosa or the details of such a conversation, but does not deny that she may have spoken with them and testified that certain aspects of the conversation described by Sosa sounded familiar. (Crooks Dep. at 54:22–55:19, 267:21–272:3.) Sosa further declares that the HR department proceeded with its investigation of Crooks' allegations, but further calls placed to Crooks were not answered or returned.[6] (Sosa Dec. at ¶ 8.)

### B. Procedural Background

On or about August 3, 2010, Crooks timely filed a written charge of discrimination against NOV with the Equal Employment Opportunity Commission ("EEOC"), alleging hostile work environment sexual harassment, gender discrimination, and retaliation. (Doc.

---

[6] The investigation revealed that Smith participated in falsifying inventory count sheets, used foul language, and demonstrated immaturity and poor leadership. (Sosa Dec. at ¶ 9.) Based on the results of the investigation, Smith was discharged by NOV on July 14, 2010. (*Id.*)

1 at ¶ 12.) She also cross-filed all of the charges with the Pennsylvania Human Relations Commission. (*Id.*) The EEOC issued a Notice of Right to Sue on or about February 28, 2011. (*Id.*) Crooks instituted this action on May 31, 2011 by filing a Complaint in this Court against NOV, asserting sexual harassment, gender discrimination, and retaliation claims under Title VII of the Civil Rights Act of 1964. (Doc. 1.) NOV moved for summary judgment on January 31, 2013. (Doc. 39.) The motion has been briefed and is ripe for disposition.

## **LEGAL STANDARD**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning,* 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police,* 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.,* 83 F.3d 68, 70 (3d Cir. 1996). However, where there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson,* 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact and (2) the

8

moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson,* 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. N.J. Meadowlands Comm'n,* 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id.* (quoting *Hugh v. Butler Cnty. Family YMCA,* 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

## ANALYSIS

### I. Hostile Work Environment Sexual Harassment Claim (Count I)

Sexual harassment is prohibited under Title VII where a plaintiff demonstrates that it was "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 447 U.S. 57, 67 (1986) (internal quotation marks omitted). In the Third Circuit, a plaintiff must establish five elements to succeed on a hostile work environment claim: (1) the plaintiff suffered intentional discrimination because of their sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability. *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990). The first four elements are required to establish a hostile work environment; the fifth determines employer liability. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

NOV contends that Crooks' hostile work environment claim fails as a matter of law because the alleged harassment was insufficiently severe or pervasive and was not based on her gender. (Doc. 41 at 7.) These arguments will be addressed in turn.

#### A. Severe or Pervasive Discrimination

To determine whether Smith's comments and behavior were severe or pervasive, the Court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a

10

mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998). Generally, mere teasing, offhand comments, and isolated mild incidents are not sufficiently severe or pervasive to establish a hostile work environment claim; Title VII is not a "general civility code." *Id.* at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-82 (1998)).

NOV contends that the alleged harassment here was not severe or pervasive, but rather a few isolated instances, and did not unreasonably interfere with Crooks' work performance. (Doc. 41 at 9–13.) Crooks has adduced evidence that Smith called her a "dumb fucking cunt" in front of other employees in the sales room every day that he was at the Troy DSC and did so even after she told him that it offended her. She has also provided evidence that Smith displayed images of nude women on computer screens in the sales room several times per month and that it made her uncomfortable. In addition, Crooks has presented evidence that Smith told her on multiple occasions that women do not belong in the oil field. She testified that Smith told her that applying for an outside sales representative position was a waste of her time because she had "tits," and when she inquired about the status of her application, he stated that a male candidate would likely be hired for the position because "bros before hoes." Crooks also testified that Smith responded angrily and negatively after she told him that she did not let a Nomac Drilling rig worker perform oral sex on her. In her resignation letter to Smidt, Crooks claimed that Smith "makes the work environment hostile" and that she could no longer work under such conditions. When viewed in the light most favorable to Crooks, the evidence is sufficient for a reasonable jury to find, after considering the totality of the

circumstances, that the allegedly harassing conduct was severe or pervasive.

### B. Harassment Based on Gender

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion] . . .* because of . . . sex.'" *Oncale*, 523 U.S. at 80. "In other words, an employer which *indiscriminately* subjects its employees to a hostile work environment commits no violation of Title VII." *Hubbell v. World Kitchen, LLC*, 688 F. Supp. 2d 401, 419 (W.D. Pa. 2010) (citations omitted). "[T]o defeat a motion for summary judgment, a plaintiff seeking to advance a hostile work environment claim must present some evidence indicating that the harassing conduct of which . . . she complains can be traced to . . . her statutorily-protected trait." *Id.* (citations omitted). To establish intentional discrimination because of sex, a plaintiff need not show "direct evidence" of the harasser's motivation or intent; "intent to discriminate can be inferred" from the record. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001).

NOV argues that Crooks cannot show that Smith's treatment of her was because of her gender, citing evidence that he treated both male and female employees poorly. (Doc. 41 at 15–17.) Crooks has presented evidence that Smith called her a "dumb fucking cunt" in front of other employees in the sales room every day that he was at the Troy DSC. She has also testified that Smith told her twice that women do not belong in the oil field. In addition, Crooks has adduced evidence that Smith told her that applying for an outside sales representative position was a waste of her time because she had "tits", and later informed her that a male candidate would likely be hired for the position because "bros before hoes." When viewed in the light most favorable to Crooks, this is sufficient evidence from which a reasonable jury could infer that the alleged harassment

was because of her sex.

### C. *Faragher/Ellerth* Affirmative Defense

"Where the alleged perpetrator of the harassment is a supervisory employee, the analysis set forth by the Supreme Court in *Faragher* and *Ellerth* supplies the appropriate framework for assessing an employer's liability." *Hargrave v. Cnty. of Atlantic*, 262 F. Supp. 2d 393, 428 (D.N.J. 2003). *Faragher* and *Ellerth* "hold that an employer is strictly liable for supervisor harassment that culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Pennsylvania State Police. v. Suders*, 542 U.S. 129, 137 (2004) (internal quotations omitted). However, when there is no tangible employment action, both decisions hold that an employer may raise an affirmative defense to strict liability for supervisor harassment: "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); accord *Faragher v. City of Boca Raton,* 524 U.S. 775, 807 (1998). In the context of constructive discharge, the Supreme Court has held that "an employer does not have recourse to the *Ellerth/Faragher* affirmative defense when a supervisor's official act precipitates the constructive discharge; absent such a 'tangible employment action,' however, the defense is available to the employer whose supervisors are charged with harassment." *Suders*, 542 U.S. at 140–141.

NOV argues that the *Faragher/Ellerth* affirmative defense is available to it because an official act did not underlie the alleged constructive discharge. (Doc. 41 at

13

17–19.) Because Crooks has neither alleged nor shown that her alleged constructive discharge resulted from "an official act of the enterprise"—*e.g.*, a demotion, reduction in compensation, or any other official act reflected in company records—the Court agrees.

NOV can avoid liability for Smith's alleged conduct by first showing that it had exercised reasonable care to avoid harassment and to eliminate it should it occur. *Faragher*, 524 U.S. at 805; *see also Ellerth*, 524 U.S. at 765. NOV contends that this prong has been satisfied because it is undisputed that NOV: is an EEO employer; has policies regarding EEO and prohibiting harassment, discrimination, and retaliation; and has a HR department that enforces these policies and investigates and resolves employee complaints. (Doc. 41 at 19.) NOV also argues that the undisputed record shows that Crooks received paperwork concerning these policies soon after being hired and understood them; she also knew of the HR department and how to contact it. (*Id.*) NOV further asserts that HR personnel contacted Crooks after she resigned, told her that her allegations regarding Smith's behavior would be investigated and acted upon, and would not accept her resignation.[7] (Doc. 63 at 9.)

However, Crooks has adduced evidence that she repeatedly told Smith that his comments and behavior offended her and may constitute sexual harassment, but he did not stop. In addition, she has presented evidence that she talked to Smidt, a regional manager, several times about Smith's "inappropriate sexual behavior." Crooks testified that one such discussion occurred after Smith told her that applying for an outside sales representative position was a waste of her time because she had "tits" and that women

---

[7] Although Crooks does not recall speaking with NOV's HR department or the details of such a conversation, she does not deny that a conversation may have occurred.

14

did not belong in the oil field. She testified that Smidt responded to her concerns by laughing and saying that Smith was joking.[8] When viewed in the light most favorable to Crooks, the record shows that NOV failed to take reasonable care to promptly correct any sexually harassing behavior by Smith. Therefore, as NOV cannot satisfy the first prong of the *Faragher/Ellerth* defense, its motion for summary judgment will be denied with respect to Crooks' hostile work environment sexual harassment claim.[9]

## II. Gender Discrimination Claim (Count I)

Title VII prohibits discrimination on the basis of sex. 42 U.S.C. §2000e-2. An employee can establish gender discrimination under Title VII in one of two ways: (1) by direct evidence that the employer's decision was motivated by discrimination; or (2) by indirect evidence that creates an inference of discrimination. In the absence of direct evidence of discrimination, as is the case here,[10] an employee must resort to the burden-

---

[8] Smidt denies that Crooks never complained to him about Smith using vulgar language or engaging in any sexually harassing or discriminatory behavior.

[9] Even if NOV could satisfy the first prong of the *Faragher/Ellerth* affirmative defense, it cannot satisfy the second, which requires NOV to show that Crooks unreasonably failed to take advantage of any preventive or corrective opportunities provided by NOV. *Faragher*, 524 U.S. at 805; *see also Ellerth*, 524 U.S. at 765. Although NOV correctly notes that Crooks did not complain to its HR department or corporate headquarters about any allegedly harassing or discriminatory conduct by Smith (or participate in HR's subsequent investigation of him), Crooks has adduced evidence that she complained to Smith and Smidt about such behavior on multiple occasions. When viewed in the light most favorable to Crooks, the record shows that she acted with reasonable care to take advantage of the safeguards provided by NOV. Accordingly, NOV cannot satisfy the second element of the defense.

[10] "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact in issue without any inference or presumption." *Weightman v. Bank of New York Mellon Corp.*, 772 F. Supp. 2d 693, 702 (W.D. Pa. 2011) (citations omitted). It is "also described as overt or explicit evidence that directly reflects a discriminatory bias that is causally related to the adverse employment decision." *Id.* (citations omitted). Based on the briefs submitted by the parties, the Court will address Crooks' gender discrimination claim under the indirect method.

15

shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to establish intent. *Weldon v. Kraft*, 896 F.2d 793, 796–97 (3d Cir. 1990). "Under *McDonnell Douglas*, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination, the existence of which is 'a question of law that must be decided by the court.'" *Ullrich v. U.S. Sec'y of Veterans Affairs*, 457 F. App'x 132, 138 (3d Cir. 2012) (citing *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007)). The bar is low for establishing a prima facie case. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).

To establish a *prima facie* case of gender discrimination under a disparate treatment theory, a plaintiff must show that: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances that could give rise to an inference of intentional discrimination. *Ullrich*, 457 F. App'x at 138 (citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).

NOV argues that summary judgment should be granted in its favor on Crooks' gender discrimination claim because she cannot satisfy the third or fourth elements of a *prima facie* case. (Doc. 41 at 32–35.) Crooks counters that she has established a *prima facie* case of gender discrimination because she was subjected to a an adverse employment action—a constructive discharge—that occurred under circumstances that could give rise to an inference of intentional discrimination. (Doc. 54 at 23–25.)

A claim of constructive discharge constitutes an adverse employment action. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998). To establish a constructive discharge, Crooks must show that NOV "knowingly permitted conditions of discrimination

16

in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984). Courts within the Third Circuit employ this objective test so that "an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (citations omitted). They consider several factors in determining whether an employee was forced to resign, including whether she "was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations." *Id.* at 169–170 (citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010)).

"To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006). Because a reasonable jury, when viewing the evidence in the light most favorable to Crooks, could find that she established a hostile work environment, a genuine issue of material fact exists as to whether she can show discrimination so intolerable that it would make a reasonable employee resign. Therefore, a genuine issue of material fact also exists as to whether the adverse employment action gives rise to an inference of unlawful discrimination. Accordingly, the Court will decline to grant NOV summary judgment in its favor on Crooks' gender discrimination claim.

### III. Retaliation Claim (Count II)

To establish a *prima facie* retaliation case, Crooks must show that: (1) she engaged in activity protected by Title VII; (2) she was subjected to a materially adverse

17

employment action; and (3) a causal link exists between the protected conduct and the employer's adverse action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006). "If an employee establishes a *prima facie* case, then the burden of production shifts to the employer to articulate a legitimate non-retaliatory reason for the action." *Weightman*, 772 F. Supp. 2d at 704 (citing McDonnell Douglas, 411 U.S. at 802). "Upon doing so, the burden shifts back to the employee to show that the employer's proffered reason is pretextual." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

NOV contends that it is entitled to summary judgment in its favor on Crooks' retaliation claim because she cannot show that she was subjected to an adverse employment action. (Doc. 41 at 35–37.) Crooks responds that she has satisfied this prong of her *prima facie* case of retaliation because she was constructively discharged. (Doc. 54 at 25–26.) Because, as discussed *supra*, a genuine issue of material fact exists as to whether Crooks was subject to a constructive discharge, the Court will decline to grant NOV summary judgment in its favor on Crooks' retaliation claim.

## **CONCLUSION**

For the reasons explained above, NOV's Motion for Summary Judgment (Doc. 40) will be denied. An appropriate Order follows.


July 26, 2013 /s/ A. Richard Caputo
Date A. Richard Caputo
United States District Judge